UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
JACKSON DIVISION

| | | |
|---|---|---|
| FOLUSO FAKOREDE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | DOCKET NO:_____ |
| | ) | |
| MID-SOUTH HEART CENTER, P.C. | ) | JURY DEMANDED |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**COMPLAINT**

1.      This is an action for retaliation under 31 U.S.C. § 3730(h) of the federal False Claims Act ("FCA").

**SUMMARY OF PLAINTIFF'S ALLEGATIONS**

2.      In July of 2013, Plaintiff Foluso Fakorede ("Plaintiff" or "Dr. Fakorede"), Defendant Mid-South Heart Center, P.C. ("the Clinic"), and the Jackson-Madison County General Hospital District ("the District") entered into a three-party Recruiting Assistance Agreement ("Recruiting Agreement").

3.      The Recruiting Agreement was designed to encourage Dr. Fakorede to establish his cardiology practice in the Jackson, Tennessee, area and to alleviate a documented and substantial need for an additional doctor practicing in the specialty of interventional cardiology.

4.      Under the terms of the Recruiting Agreement, Dr. Fakorede would be employed by the Clinic, effective November 1, 2013, and the District agreed to provide various forms of financial support, including a transition advance, moving expenses, educational loan repayment, and a first-year income guarantee.

1

5.      In exchange, Dr. Fakorede agreed to remain in practice as a cardiologist in the Jackson, Tennessee area for at least three years.

6.      The United States Centers for Medicare and Medicaid Services ("CMS") has recognized recruiting agreements as a valuable tool for attracting skilled physicians to underserved areas.  However, CMS has also recognized the risk of hospitals using recruiting agreements to mask kickbacks to favored practice groups, in exchange for those practice groups referring patients to the hospital.

7.      In light of this risk, recruiting agreements are typically not permitted under federal law if the practice group—*i.e.*, the employer of the recruited physician—receives any direct financial benefit, or if the agreement is conditioned in any way on referring patients to the hospital.  *E.g.*, 42 C.F.R. § 411.357(e)(iii).

8.      In fact, the recruiting agreement between Dr. Fakorede, the District, and the Clinic included an exhibit expressly agreeing and affirming that the agreement was not intended to financially benefit the Clinic.

9.      Unfortunately, despite the express agreement between the three parties, the Clinic took unlawful advantage of the Recruiting Agreement and attempted to use the Recruiting Agreement to subsidize operations of the practice group that had no reasonable relationship to the actual costs of setting up Dr. Fakorede in his practice.  Dr. Fakorede had grave concerns that within the first year of his medical practice he was becoming intertwined in an illegal kickback scheme, and he raised these concerns.  In retaliation for raising these concerns and taking direct actions to prevent the illegal kickback scheme from unfolding, the Clinic terminated Dr. Fakorede.

10.     Specifically, beginning in December 2014, after one year of working at the Clinic, Dr. Fakorede became concerned that the Clinic might be submitting financial statements to the District that significantly overstated the direct expenses being attributed to Dr. Fakorede, in order to increase the amount of financial support provided by the District.  He further worried that these overstatements were deliberate and potentially violated federal laws governing kickbacks and physician self-referral.

11.     Dr. Fakorede raised his concerns in late December 2014 and January 2015, and he insisted that the District perform a full audit of the Clinic's reporting statements, to make sure that the Clinic was not violating federal law.

12.     The District initially did its best to ignore Dr. Fakorede's requests and indicated that it was satisfied with the figures submitted by the Clinic.

13.     Even though officials from the District were slow to respond and unwilling to help Dr. Fakorede in any meaningful way—even as he was trying his best to save the District from making needlessly large payments to the Clinic—when the District did finally accede to Dr. Fakorede's request and reviewed the Clinic's financial records in detail, the District was forced to acknowledge that Dr. Fakorede was right.  Specifically, the District determined that over $200,000 in expenses that the Clinic had claimed for Dr. Fakorede and that the District had reimbursed were attributable to an outpatient based lab ("OBL") the Clinic had been constructing, and that these expenses should never have been reimbursed by the District.

14.     Representatives of the District informed Dr. Fakorede and the Clinic of the District's decision to disallow the OBL expense.

15.     A few days later, the District informed Dr. Fakorede and the Clinic that the District was initiating a line item audit of the financial report.

16.     One week later, the Clinic fired Dr. Fakorede, in direct retaliation for his efforts to prevent a violation of the federal Stark Law and federal Anti-Kickback Statute.

## PARTIES AND OTHER RELEVANT ENTITIES

17.     Plaintiff Foluso Fakorede ("Plaintiff" or "Dr. Fakorede") is currently a resident of Grenada, Mississippi, though at all times relevant to this complaint he was a resident of Jackson, Madison County, Tennessee. Plaintiff is a medical doctor practicing in the specialty of interventional cardiology and was employed by Defendant Mid-South Heart Center, P.C. ("the Clinic") from November 1, 2013 until his termination on February 10, 2015.  In addition to his employment relationship with the Clinic, Doctor Fakorede was a party to a three-party Physician Recruiting Assistant Agreement with the Clinic and Jackson-Madison County General Hospital District ("the District").

18.     Defendant Mid-South Heart Center, P.C. ("the Clinic"), is a Tennessee professional corporation with its principal office at 48 Medical Center Drive, Jackson, TN 38301.   The Clinic employed Dr. Fakorede from November 1, 2013 until February 10, 2015, when it fired him in retaliation for exposing and thwarting an illegal kickback scheme it was attempting to effectuate. The Clinic was also a party to the three-party Physician Recruiting Agreement with Plaintiff and the District.

19.     Doctors at the Clinic perform significant numbers of cardiology procedures at District-owned hospitals.  These procedures are very profitable for the District. Had Dr. Fakorede not stepped forward and blown the whistle, it seems certain that the District would have simply accepted the bogus financial information from the Clinic in order to retain the Clinic's valuable referrals.

## JURISDICTION AND VENUE

20.     Jurisdiction is founded upon the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, specifically 31 U.S.C. § 3732(a), and also upon 28 U.S.C. § 1331.

21.      Venue in the Western District of Tennessee, Jackson Division, is appropriate under 28 U.S.C. § 1391(b), and under Local Rule 3.3(b)(2), because the claim arose and the complained of events occurred in Madison County, Tennessee.

## GOVERNING LAW

**I.     The Federal False Claims Act ("FCA")**

   **A.     Protection for Individuals Who Attempt to Stop Suspected Fraud**

22.     The federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, is a federal statute designed to create liability for any person or entity who submits false and fraudulent claims for payment to the United States.

23.     One basic purpose of the FCA is to encourage individuals with knowledge of suspected fraud to come forward and to take steps to prevent such fraud.

24.     Accordingly, the FCA contains explicit protections for individuals who take efforts to stop violations of the FCA.

25.     Under 31 U.S.C. § 3730(h), "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

**B.      Kickbacks as a Form of Fraud under the FCA**

26.      The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits direct or indirect payment, transfer, or solicitation of anything of value, whether in cash or in kind, in order to induce or reward a person for referrals for items or services reimbursable under a federal health care program.

27.      By its express terms, this statute prohibits solicitation and receipt of kickbacks, as well as the offer to pay and the actual payment of kickbacks.  *Id.*

28.      Moreover, pursuant to 42 U.S.C. § 1320a-7b(g), any claims submitted to Medicare for items or services tainted by unlawful kickbacks constitute false and fraudulent claims under the FCA.

**C.      Physician Self-Referral as a Form of Fraud under the FCA**

29.      Under the Physician Self-Referral Act, commonly known as the "Stark Law," 42 U.S.C. § 1395nn, physicians cannot refer patients to any specified health care entities, such as a hospital, if the physician has a "financial relationship" with that entity.

30.      Any claims submitted for payment to Medicare for items or services tainted by unlawful self-referral constitute false and fraudulent claims under the FCA.

31.      Physician Recruiting Agreements, such as the agreement entered into by Plaintiff, the Clinic, and the District in this case, are exempt from Stark Law coverage only if they meet certain requirements.

32.      In particular, in order to be exempt from Stark Law coverage, any physician recruiting agreement that includes an income guarantee by the hospital to the physician must be structured in such a way that "the costs allocated by the physician practice to the recruited

physician do not exceed the actual additional incremental costs attributable to the recruited physician." 42 C.F.R. § 411.357(e)(iii).

## FACTS

**I.      Plaintiff is Recruited to Work as a Cardiologist in Jackson, Tennessee**

33.      In late spring 2012, Plaintiff was completing the third year of his general cardiology fellowship at Cooper University Hospital, in Camden, NJ. Although he had another 15 months of interventional cardiology training to complete, Plaintiff was already starting to consider options for where to establish his practice.

34.      During this period, Plaintiff spoke by phone several times with Dr. Tommy Miller, one of the partners at the Clinic.  Dr. Miller had been an interventional cardiology fellow at Cooper University Hospital while Plaintiff was a medical student in the same program, so the two knew each other.  Plaintiff was approached by the Clinic, who suggested that Plaintiff join its practice group as an interventional cardiologist in Jackson, Tennessee.

35.      In or around May of 2012, a representative of the District, recruiter Cheri Spencer, explained to Plaintiff that the Jackson, Tennessee area had a documented need for an additional cardiologist and that, because of this need, the District was able to offer a recruitment package.

36.      Accordingly, Plaintiff visited Jackson, Tennessee during this period, together with his wife and children, and looked at potential houses with a realtor.

37.      After some negotiation, Plaintiff signed a "Physician Employment Agreement" ("Contract") with the Clinic on July 15, 2013. On the same day, Plaintiff signed a Physician Recruiting Agreement ("Recruiting Agreement") with the District, to which the Clinic was also a party.

38.     By their terms, these documents both had commencement dates of November 1, 2013. Accordingly, in the fall of 2013, Relator moved from New Jersey to Jackson, Tennessee and began to establish his cardiology practice.

## II.     Relevant Terms and Provisions of the Recruiting Agreement

39.     Under the terms of the Physician Recruiting Agreement ("Recruiting Agreement"), the District agreed to advance the following amounts to Plaintiff to help him establish his practice in Jackson:

   a. A one-time moving advance of $5,000;
   b. A one-time transition advance of $75,000;
   c. Educational loan repayment of $30,000 per year for each of the Recruiting Agreement's three covered years.

40.     In addition to these three types of advances, the District also agreed to establish a Net Collection Support Account, up to a maximum amount of $500,000, for Plaintiff's first year of practice. The purpose of this support account was to supplement Plaintiff's net collections while he was working to establish a patient base and settle into the area.

41.     The maximum amount the District agreed to provide was the difference between Plaintiff's actual net collections during the year and $500,000. So, for example, if Plaintiff brought in gross collections of $400,000 during year one and incurred expenses of $100,000, then his net collections would be $300,000 and the District would advance him up to $200,000 (*i.e.*, the difference between $500,000 and $300,000).

42.     The District's financial obligations under this formula depended in part on what expenses the Clinic claimed as being "actual direct incremental expenses" attributable to the Plaintiff's employment. Accordingly, the District required the Clinic to submit a financial statement no later than thirty days after the end of Plaintiff's first year of practice.

43.     If it turned out that Plaintiff and the Clinic had drawn more than the permitted amount, the District required that Plaintiff and the Clinic refund the difference. To avoid incurring interest, any overpayment would have to be repaid within 30 days.

44.     Although this Net Collection Support Account was identified in the Recruiting Agreement as a benefit provided to Plaintiff, it was just as much of a benefit to the Clinic. Specifically, because of the existence of this support account, the Clinic was able to hire Plaintiff into its practice group with almost no financial risk. So long as the expenses related to hiring and employing Plaintiff did not exceed the money generated by Plaintiff during his first year by more than $500,000—which was unlikely to happen—then the Clinic would not incur any actual costs.

45.     In fact, the Clinic required Plaintiff to immediately sign over his monthly draws from the District to Clinic every time he received them.

46.     In exchange for the financial support provided by the District, Plaintiff agreed to remain in active practice as a cardiologist in the greater Jackson, Tennessee area for at least three years and further agreed to maintain medical staff privileges at Jackson-Madison County General Hospital for the three-year term of the agreement.

47.     Under the terms of the Recruiting Agreement, if Plaintiff fulfilled all of his obligations for the three-year term of the Agreement, then the District agreed to forgive all debt that Plaintiff had incurred.

48.     In contrast, if Plaintiff did not fulfill his obligations, then he would be obligated to repay all of the funds that had been advanced by the District immediately.

III.    **Plaintiff Suspects and Reports on what he Believes to be Unlawful Expenses Attributed to him by Defendant Mid-South Heart Center**

49.     Plaintiff completed his first year with the Clinic on October 31, 2014.

9

50.     It was a productive year for Plaintiff. His gross collections amounted to $751,221.92.

51.     Despite his productivity, the Clinic instructed Plaintiff to take the maximum possible draw from the account support loan for the first two quarters and a sizable amount of the support loan for the last two quarters, and then to immediately assign those funds to the Clinic. The Plaintiff did this with the understanding that the Clinic would be responsible for determining his expenses, calculating net collections, and repaying the District for any amounts overdrawn from the support account.

52.     During his first year of practice, the Plaintiff was not provided data regarding the collections he brought into the Clinic, or with any data regarding expenses that the Clinic was attributing to establishing his practice.

53.     Under the terms of the Recruiting Agreement, the Clinic was required to submit its year-end financial statement to the District within 30 days of the end of the first term, November 30, 2014, to provide evidence to the District of the gross collections the Plaintiff had brought in to the practice, as well as evidence of the expenses that the Clinic was declaring as actual incremental expenses related to the Plaintiff's practice. However, the Clinic did not provide that statement by the required date.

54.     On or about December 8, 2014, Plaintiff requested these records from Carla Reeves, Financial Director for the District, which is when he learned that the Clinic had not submitted the 12 month financial report.

55.     Plaintiff asked Ms. Reeves to send the records to him as soon as she had them, because Plaintiff wanted a chance to review the Clinic's calculations before they were submitted in final form. Ms. Reeves offered the Plaintiff a partial financial statement for the first two

quarters of his term that the Clinic had submitted, dated June 10, 2014 and signed by the accounting firm for the Clinic, Horne, LLC.   Plaintiff had never been provided this report by either the Clinic or the District before this time.

56.     Plaintiff reviewed the partial report for Quarters 1 & 2, and became very concerned by the Clinic's numbers.  The Clinic calculated Plaintiff's first quarter net collections as negative $48.26, despite the fact that his first quarter gross collections were listed as $99,879.75.  Likewise, during the second quarter, the Clinic calculated his net collections to be only $6,258.14, despite gross collections of $188,894.41.   These discrepancies prompted Plaintiff to look more closely at the expenses being attributed to him by the Clinic.  When he did so, he was very troubled by what he saw.

57.     Most notably, Plaintiff was troubled by the fact that the Clinic had attributed more than $127,000 in "depreciation expense" to him, which was identified as being related to equipment purchased, moved, and installed at the Clinic's newly-completed outpatient-based lab ("OBL").  Plaintiff was particularly concerned about this calculation because the OBL had not been used at all until about August of 2014, and Plaintiff himself had not used it until late October, 2014.

58.     Plaintiff was also concerned by the significant expenses being attributed to him for "salaries and wages (incremental staff)," legal and professional expenses, consulting expenses, and "medical supplies (nuclear & OBL)."

59.     By the end of 2014, Plaintiff had still not received the year-end financial statement from the Clinic, despite several requests.

60.     Accordingly, in early January, Plaintiff emailed Ms. Reeves to again request this financial statement, noting again that he wished to review these records with his own accountant

before they were finalized.   Given his concerns regarding some of these claimed expenses, Plaintiff also requested the underlying documents justifying the Clinic's calculations.

61.     On January 9, 2015, Plaintiff finally received the full-year financial report, though he did not receive the underlying documents or data he had asked for.   Plaintiff had specifically requested this underlying documentation on several different occasions, including on January 5th, 6th, and 8th.

62.     Upon reviewing the year-end financial report, Plaintiff again found numerous troubling expenses that the Clinic asserted as being directly attributable to Plaintiff's employment, but that Plaintiff knew were not related to his employment.

63.     The total "depreciation" expense attributed to Plaintiff for the year was $207,230.94.   This was, by far, the largest single expense charged to Plaintiff.   The next highest, for medical supplies, was $131,190.04.

64.     The total salaries and wages for staff attributed to Plaintiff was $110,051.52—$66,578.36 of which was ostensibly for "incremental staff" and $43,473.16 of which was ostensibly "attributed to increase in volume."

65.     In total, the Clinic was claiming that $588,418.67 in expenses were directly attributable to Dr. Fakorede for his first year of practice.

66.     On January 9, 2015, the same day that Carla Reeves received the year-end numbers from the Clinic and circulated them to Plaintiff, Ms. Reeves also sent an email to Charlotte Beard, Practice Manager for the Clinic, and Mickey Hannon, the Clinic's outside accountant, noting that Plaintiff had "raised some questions" and was requesting certain underlying documents.   Pursuant to that request, Ms. Reeves asked the Clinic to provide a detailed schedule to support the depreciation calculations.

67.     On January 10, 2015, Plaintiff sent an email addressed to both the District and the Clinic, the recipients being Carla Reeves, Charlotte Beard and Mickey Hannon, in which Plaintiff expressed concerns about the financial report and requested that the District collaborate with the Clinic to revisit the Depreciation expense drawn from his loan.   In that email, Plaintiff specifically noted that, to the best of his knowledge, he had used the OBL for the first time on October 29, 2014, just a few days prior to the end of his term on October 31, 2014.

68.     On January 12, 2015, Mickey Hannon, an outside accountant working for the Clinic, responded to Ms. Reeves to defend the depreciation expenses being attributed to Plaintiff. In his email, Mr. Hannon stated that the Clinic had begun initial plans during the summer of 2013 to renovate its facilities to accommodate a new OBL/vein lab.  Mr. Hannon claimed that the renovation of this space and the addition of an OBL/vein lab were being done expressly "in anticipation" of hiring a new cardiologist, and that it was therefore reasonable to attribute such expenses to Dr. Fakorede for purposes of the financial statement.  Mr. Hannon did acknowledge, however, that no patients were seen in the new lab until August 2014.

69.     By this point, Plaintiff had become concerned that the Clinic was deliberately and fraudulently misclassifying many of its expenses—particularly those related to the OBL—as being related to Plaintiff's employment in order to get the District to pay for them. In other words, by attributing these expenses to Dr. Fakorede, the Clinic was attempting to improperly justify retaining the District's advanced payments to subsidize its practice.  Because such an outcome would constitute an illegal kickback arrangement, Dr. Fakorede continued to express his objections.

70.     Under the terms of Plaintiff's agreement with the Clinic, the Clinic indemnified Plaintiff for any overpayment that had to be returned to the District, so that Plaintiff was not

personally responsible for any overdrawn funds.  However, as a new doctor in a relatively small market, Plaintiff was concerned about his own reputation if he did not speak up about the illegal schemes.  Moreover, Plaintiff believed, as a matter of principle, that it was simply not right for the Clinic to retain hundreds of thousands of dollars advanced by the District that the Clinic had no right to keep.

71.     Plaintiff determined he needed to go over Ms. Reeves' head if he was going to get any meaningful response from the District.

72.     Accordingly, on January 16, Plaintiff sent a detailed email directly to the District's CEO, Bobby Arnold, requesting an independent review of the District's report. In this email, Plaintiff specifically noted that he had requested supporting documentation, including a depreciation schedule, but had never received anything.   Because of his concerns about the Clinic's accounting shenanigans and the District's seeming inclination to go along with them, Plaintiff asked CEO Arnold to initiate an independent review by an auditor qualified "in health care matters who is familiar with Physician Assistance Agreement and Loan Income Guarantees."  It was Plaintiff's hope that that by engaging a new independent auditor, the Clinic and the District would be forced to comply with the law.

73.     As of January 21, Plaintiff had not received a response from Mr. Arnold, so Plaintiff went to see Mr. Arnold personally to raise his concerns again, face-to-face. Mr. Arnold was not in his office when Plaintiff arrived, so Plaintiff spoke to Mr. Arnold's secretary, who asked Plaintiff to resend his email and reassured him that she would make sure Mr. Arnold received it.

74.     As of January 30, Plaintiff still had not received a response from Mr. Arnold.   However, on that date, a hospital recruiter, Vanessa Patrick, who was responsible for

recruiting cardiologists, called Plaintiff on his cell phone to inform him that the District had disallowed the $207,230.94 "depreciation expense."  She did not mention any of the other charges that Plaintiff had flagged as questionable in his email to Mr. Arnold or in his earlier communications to Ms. Reeves.

75.     On February 2, Plaintiff had still not heard from CEO Arnold, so he made another request for an appointment with CEO Arnold via his secretary Trenna.

76.     However, as Plaintiff was walking out of the Administration Office area, Plaintiff received a text message from the Vice President, Deann Montchal, informing him that she has been "in conversation with everyone" and if Plaintiff had any questions, he should reach out to her.

77.     Plaintiff met with VP Montchal after receiving the text message.  VP Montchal noted that she had spoken by phone to Dr. Cunningham, CEO of the Clinic, on January 30, 2015 and told him that the District would be requesting a refund of the approximately $207,000 identified as "depreciation" expenses for the OBL.  VP Montchal did not directly address any of the other categories of expenses claimed by the Clinic that also appeared to be inflated, though she promised Plaintiff that there would be transparency going forward.

78.     After Plaintiff's meeting with VP Montchal on February 2, CEO Arnold called Plaintiff and similarly assured Plaintiff that there would be transparency going forward and that Plaintiff and Mr. Arnold could have an in-person meeting at some point in the near future.

79.     The next day, February 3, VP Montchal sent Plaintiff a text message saying that the District was requesting a complete line-item audit of the Clinic's financial statement.

80.     Plaintiff responded to her by email expressing that he was reassured by the line-item audit, and Plaintiff reminded VP Montchal that the Recruiting Agreement that was signed

15

by the District, the Clinic and himself, contained express language stating that the Recruitment Agreement was not meant to advance the clinic's financial interests and that only expenses permitted by federal law for the hospital to cover are those expenses that are "the actual incremental expenses of recruiting the Physician and establishing the Physician's practice."

81.     Plaintiff received no further updates for a week.

82.     On February 9, 2014, Plaintiff sent a text message to VP Montchal asking for an update on the audit, specifically asking if she had received any documents from the Clinic.   She replied, "I saw one document last week that just spoke to medical supplies.  We have asked every line item be audited."

83.     The next day, February 10, 2014, Dr. Cunningham, CEO of the Clinic, requested to meet Plaintiff at 6:00pm that evening.

84.     At the meeting, Dr. Cunningham told Plaintiff to sign a letter of resignation by 7:00 am the next morning, or else Plaintiff would be terminated. Dr. Cunningham provided no explanation for this demand, other than stating generally that he knew Plaintiff was not happy and that the Clinic was not happy either.

85.     At approximately 6:30 a.m. the next morning, Plaintiff sent a message to Dr. Cunningham stating that Plaintiff was not willing to sign a resignation letter with the District's audit pending and without having ever received the corrected financial report to review.

86.     Dr. Cunningham immediately responded by text message, informing Plaintiff that he was terminated from his position, effective immediately.  Specifically, Dr. Cunningham's text read "Dr. Fakorede your employment is terminated repeat is terminated.  Any further communication concerning this matter may be directed to my attorney, Mr. Todd Siroky...".

16

87.     The Clinic later sent Plaintiff a letter stating that the Clinic was exercising its option to terminate him without cause.

88.     The letter further stated that the Clinic was providing the Plaintiff with 120 days of pay, rather than the 120 days of notice that the employment agreement between Plaintiff and the Clinic actually required.

89.     This retaliatory termination put Plaintiff in a very difficult position regarding his obligations to the District under his Recruiting Agreement.   Specifically, under the terms of the Recruiting Agreement, Plaintiff was required to remain on staff at the Hospital during the entirety of the Agreement's three year term.  Under the Hospital's bylaws, in order to be on staff, doctors have to have a primary, physical office outside the Hospital where the doctor could see patients.

90.     Accordingly, in order to fulfill the terms of the Agreement, Plaintiff had to either remain affiliated with a practice group in the Jackson area, or establish an office of his own.

91.     Plaintiff immediately notified both CEO Arnold and VP Montchal by email of his termination. In that email he stated: "This decision to terminate my employment, of course, comes amidst the line audit of the financial report for year one of my employment that is currently underway which thus far has revealed a false $207,000 dollars which was in clear violation of the recruiting agreement (stating that the agreement is not to be used for the Clinic's financial benefit) and in violation of Stark Laws. It is fundamentally wrong to use the physician recruiting agreement funds which are aimed to assist the underserved patients of community to the benefit of the clinic, which is why the stark exception for physician recruitment agreements exists."

92.     Mr. Arnold provided a non-committal response, simply stating that he regretted the development, was committed to a "fair and legal resolution of all issues for all involved," and looked forward Plaintiff's continued service to the Hospital.

93.     Over the next several weeks, Plaintiff corresponded regularly with Hospital VP Montchal to clarify his status and obligations under the Recruiting Agreement and also to ask for updates in the District's audit of the Clinic's financial records.   Plaintiff also specifically asked for supporting documentation of the Clinic's reported expenses two additional times, on February 13 and February 23.

94.     On February 25, 2015, Plaintiff received a letter from Charleyn Reviere, the District's General Counsel, stating that she was responding on behalf of VP Montchal to the emails that Plaintiff sent to Ms. Montchal.   In that letter, Ms. Reviere stated generally that the reconciliation process between the District and the Clinic was "nearing conclusion."

95.     On March 5, 2015, Ms. Reviere sent Plaintiff two letters.

96.     The first of these letters set forth the final results of the District's audit.   Based on the revised figures, the District concluded that the Clinic had overdrawn the Practice Support Account by $314,238.08, which had to be refunded.   As Plaintiff had suspected—and as he repeatedly told officials from the District—the audit had determined that the $207,230.94 originally attributed to Plaintiff as a "Depreciation Expense" was not a legitimate expense attributable to him under the terms of his contract, and additional expenses were also disallowed resulting in the final figure of the overdraw.

97.     The District's internal audit determined the allowable expenses still amounted to $332,088.46.

98.     Despite these revisions, Plaintiff still had, and continues to have, serious concerns about the report's accuracy, and believes that unlawful expenses remain in the final audit report.   To this date, Plaintiff has still not received the supporting documents, which he requested on numerous occasions to numerous District officials.

99.     Plaintiff continues to believe that the Clinic was knowingly attempting to have the District pay for other expenses that were unrelated to Plaintiff's employment, and that the District did not seriously review the legitimacy of these expenses.

100.    The Clinic and its doctors perform numerous procedures at the District's hospitals each year, and the District had a distinct incentive to keep the Clinic happy and turn a blind eye to the fraudulent financial statements.

101.    Had Dr. Fakorede not come forward and addressed his concerns that a Stark Act and/or Anti-Kickback Act violation was occurring, it is clear from the District's slow response that the District would never have requested this refund.  In short, Dr. Fakorede blew the whistle, exposed the fraud, and was rewarded by the Clinic with the prompt termination of his employment.

102.    The second letter from the District stated the District's understanding that "Dr. Fakorede and MSHC [the Clinic] have ended their employment relationship" and emphasized that "[s]hould Dr. Fakorede leave the community or cease practicing here, then the current balance of the recruiting indebtedness would be due immediately."

103.    Notwithstanding this letter from the District, the Clinic's retaliatory termination of Plaintiff's employment made it untenable for him to remain in Jackson, Tennessee.  Accordingly, he moved to Mississippi, where he now practices.

## CAUSES OF ACTION

### Count I
### Retaliation in violation of 31 U.S.C. § 3730(h)
### (Asserted against Defendant Mid-South Heart Center, P.C.)

107.    Plaintiff repeats and reasserts the allegations contained in the above paragraphs as though fully set forth herein.

108.    Defendant Mid-South Heart Center, P.C. retaliated against Plaintiff by terminating him from his position after he engaged in the protected activity of reporting to Jackson-Madison County General Hospital District what he believed to be fraudulent expenses, submitted in violation of the federal Stark Law and Anti-Kickback Statute, that the Defendant Mid-South had falsely ascribed as costs relating directly to Plaintiff's practice during his first year as cardiologist.

109.    Defendant knew that Plaintiff had engaged in this protected conduct, and Defendant terminated his employment in retaliation for Plaintiff engaging in this protected conduct.

110.    Pursuant to 31 U.S.C. § 3730(h),  Plaintiff is entitled to all relief necessary to make him whole, specifically including, without limitation, two times his actual back pay, reinstatement, and the costs of litigation, including his reasonable attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks the following relief under the federal False Claims Act:

A.    Back pay damages and prejudgment interest to the fullest extent permitted under the law;

B.    Liquidated damages to the fullest extent permitted under the law;

C.      Special damages, including reimbursing Plaintiff for any and all costs that he is required to repay to the Jackson-Madison County General Hospital District as a result of being terminated from his employment at the Clinic;

D.      Damages incurred by Plaintiff as a result of his inability to secure comparable employment;

E.      Damages related to Plaintiff's emotional distress and Plaintiff's professional reputation and character;

F.      Litigation costs, expenses, and attorneys' fees to be paid by Defendant Mid-South Heart Center to the fullest extent permitted under the law;

G.      Such other and further relief as this Court deems just and proper.


**JURY TRIAL DEMANDED**

Plaintiff demands a jury as to all claims so triable.



Dated: November 25, 2015                    Respectfully Submitted:

/s/Jerry E. Martin_____
Jerry E. Martin (TN BPR No. 20193)
Scott P. Tift (TN BPR No. 27592)
Seth M. Hyatt (TN BPR No. 31171)
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, Tennessee 37219
Phone:  (615) 244-2202
Fax: (615) 252-3798
jmartin@barrettjohnston.com
stift@barrettjohnston.com
shyatt@barrettjohnston.com