**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**AT JACKSON**


| | | |
|---|---|---|
| **FALUSO FAKOREDE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No.: 1:15-cv-01285-JDB-EDB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MID-SOUTH HEART CENTER, P.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF FACTS AND LAW IN SUPPORT OF**
**MID-SOUTH HEART CENTER, P.C.'S MOTION TO DISMISS**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Mid-South Heart Center, P.C. ("MSHC") respectfully moves to dismiss the Complaint of Foluso Fakorede, M.D. in its entirety for failure to state a claim upon which relief can be granted.

**PRELMINARY STATEMENT**

Dr. Fakorede's sole theory of recovery in this litigation is that MSHC retaliated against him for engaging in activities in furtherance of bringing a *qui tam* action under the False Claims Act ("FCA") or attempting to stop a violation of the FCA. *See* 31 U.S.C. § 3730(h)(1). His Complaint fails to state a claim under either theory for several reasons.

First, Dr. Fakorede never filed or indicated that he intended to file a *qui tam* action under the FCA prior to his termination. Nor does his Complaint allege that he ever furthered or even contemplated furthering an FCA claim. Thus, he cannot show he engaged in a protected activity by furthering an FCA claim.

Second, Dr. Fakorede cannot show that he engaged in protected activity by trying to stop an FCA violation. The Complaint's allegations chiefly pertain to a Recruiting Agreement that

1

Dr. Fakorede entered with the Jackson-Madison County General Hospital District ("Hospital") and MSHC, but he concedes, as he must, that the Recruiting Agreement facially complies with the FCA and other applicable law. He alleges that he asked questions about certain expenses that MSHC attributed to him under his Recruiting Agreement, but he does not allege that he raised concerns about potential fraud on the government. Simply raising questions and concerns about whether he would be liable for certain expenses under a Recruitment Agreement, standing alone, does not plausibly embody efforts to stop an FCA violation. The Complaint does not allege that Dr. Fakorede said or did anything at the time that would have indicated that he was acting to prevent violations of federal law.

Third, the Complaint does not allege that MSHC had notice of Dr. Fakorede's alleged protected activities. The vast majority of the conduct described in the Complaint was directed at the Hospital, not MSHC. The Complaint only alleges that MSHC's practice manager and outside accountant were on two emails in which Dr. Fakorede raised some questions about financial reports submitted pursuant to his Recruiting Agreement. That could not have plausibly put MSHC on notice that Dr. Fakorede was furthering an FCA claim, attempting to stop an FCA violation, or even claiming that any fraudulent conduct had occurred.

The Complaint never alleges that Dr. Fakorede expressed concerns about fraud on the government or violations of federal law to MSHC or anyone else prior to his termination – which courts have repeatedly held is required to establish the notice element of an FCA retaliation claims. Indeed, from MSHC's perspective, Dr. Fakorede's questions about the financial reporting were aimed at assessing and mitigating his potential liability under the Recruiting Agreement, not at exposing or stopping healthcare regulatory violations. According to the Complaint, Dr. Fakorede did not mention that the financial reports might implicate healthcare

regulatory law until ***after*** he was terminated, which is insufficient to satisfy the notice element of his FCA retaliation claim.

Finally, the Complaint fails to allege facts that, taken as true, support a plausible causal link between his termination and his alleged protected activity.

## SUMMARY OF ALLEGATIONS[1]

### I.    Dr. Fakorede's Recruiting Agreement and Employment Agreement

On or about July 15, 2013, Dr. Fakorede signed a Physician Recruiting Assistance Agreement ("Recruiting Agreement") with the Hospital and MSHC.  (Compl. ¶ 2.)  The stated purpose of the Recruiting Agreement was to incentivize Dr. Fakorede to locate his cardiology practice in Jackson, Tennessee, in order to address a "substantial need for an additional physician practicing in the specialty of Interventional Cardiology" and "benefit the community and the Service Area through increased availability, quality, and choice of patient care."  (Recruiting Agreement, at p. 1 (attached as "Exhibit A"); *see also* Compl. ¶ 3.)[2]  Under the terms of the Recruiting Agreement, the Hospital would provide Dr. Fakorede up to $5,000 for moving expenses, $75,000 for a cost of transition advance, a total of $90,000 in repayment toward his educational loans, and up to $500,000 in practice support for his first year of practice, depending upon his net collections for that year.  (*See* Ex. A, Recruiting Agreement ¶ 3; Compl. ¶¶ 39-40.) In exchange for this support, Dr. Fakorede agreed, among other things, that he would locate his medical practice within the Hospital's service area and actively practice in that area for at least three years.  (*See* Ex. A, Recruiting Agreement ¶ 2; Compl. ¶ 5.)  If Dr. Fakorede left the

---

[1]     The following facts are derived from allegations in Mr. Fakorede's Complaint or documents incorporated by reference in that Complaint, and these facts are accepted as true only for purposes of this Motion.

[2]     True and correct copies of all Exhibits are attached to the Declaration of Brittain W. Sexton that is filed concurrently herewith.

Hospital's service area prior to the end of the three-year period, then Dr. Fakorede would have to pay back to the Hospital any sums paid to him or on his behalf under the Recruiting Agreement. (*See* Ex. A, Recruiting Agreement ¶ 2(j).)

Dr. Fakorede does not allege that the Recruiting Agreement in any way violates federal law or was otherwise improper. Indeed, he concedes that "[t]he United States Centers for Medicare and Medicaid Services ('CMS') has recognized recruiting agreements as a valuable tool for attracting skilled physicians to underserved areas" and that recruiting agreements, such as the Recruiting Agreement here, are generally "exempt from Stark Law coverage" so long as all necessary criteria are satisfied. (Compl. ¶¶ 6, 31.)

Dr. Fakorede's only issue pertains to certain expenses that MSHC attributed to his working with MSHC. The Recruiting Agreement permitted Dr. Fakorede to draw up to $500,000 from a Net Collections Support Account during his first year of practice. (*See* Ex. A, Recruiting Agreement ¶ 3(d).) The Recruiting Agreement defines "Net Collections" as "Physician's Collections less the amount of legally allowable reasonable direct expenses of Physician's practice and reasonable allocation of indirect expenses that are attributable to Physician." (*Id.* ¶ 1(c).) It then defines "Reasonable allocation" as "an allocation of indirect expenses that is reasonable, as determined by the Hospital, and such allocation shall not exceed the actual, additional incremental costs to group practice that are attributable to Physician." (*Id.*) In other words, the amount that Dr. Fakorede could retain from his Net Collections Support Account depended upon the difference between his gross collections and the expenses that the Hospital determined was reasonable to attribute to him.

Pursuant to the Recruiting Agreement, funds from the Net Collections Support Account would be provided to Dr. Fakorede "on an as-needed and as-requested basis." (*Id.* ¶ 3(d).) Dr.

Fakorede's ability to withdraw and retain funds were contingent on receipt of appropriate financial reporting: "Provided financial reporting is submitted to Hospital on a periodic basis as determined by Hospital, Physician may request draws." (*Id*.) The Recruiting Agreement also requires that Dr. Fakorede or MSHC refund any overage upon notice by the Hospital: "Physician and Clinic agree that any overage will be promptly refunded to Hospital." (*Id.* ¶ 3(e).)

At the same time that he entered the Recruiting Agreement, Dr. Fakorede also entered a Physician Employment Agreement ("Employment Agreement") with MSHC. (*See* Employment Agreement (attached as "Exhibit B").) That agreement sets forth Dr. Fakorede's job duties while employed with MSHC. The Employment Agreement cross-references the Recruiting Agreement and attaches it as an exhibit. (*See id.* ¶ 27.) The Employment Agreement states that, as "a condition precedent to Physician's obligation to become employed, the parties agree to execute and comply with a physician recruiting incentive agreement [*i.e.*, the Recruiting Agreement] . . . and any associated documents and agreements requested by the Hospital." (*Id.*) In other words, Dr. Fakorede's employment duties required compliance with the terms of his Recruiting Agreement.

Under the Employment Agreement, MSHC agreed that it would indemnify Dr. Fakorede for any refund sought by the Hospital for an overage from Net Collections Support Account based on the calculations described in Paragraph 3(e) of the Recruiting Agreement. (*See id.* ¶ 27.) If, however, Dr. Fakorede breached the Recruiting Agreement by leaving the Jackson, Tennessee service area before the end of the three-year term, which he ultimately did by moving to Mississippi (*see* Compl. ¶ 103), then he would be personally liable to refund the balance of funds that he had withdrawn under the Net Collections Support Account. Accordingly, it was in

Dr. Fakorede's financial interest to minimize any expenses that MSHC attributed to him under the Recruiting Agreement because this would have reduced his personal liability to the Hospital for breaching the Recruiting Agreement by moving outside of the service area. (*See* Ex. A, Recruiting Agreement ¶ 2(j).)

## II.     Financial Reports Related to the Net Collections Support Account

Dr. Fakorede completed his first year with MSHC on October 31, 2014. During his first year of practice, MSHC instructed him to withdraw the maximum amount from the Net Collections Support Account in the first two quarters and a "sizeable amount" in the final two quarters. (*See* Compl. ¶ 51.) He assigned all withdrawn funds to MSHC. (*See id.*) Pursuant to his Recruiting Agreement, Dr. Fakorede or MSHC was obligated to refund the difference between the total amount Dr. Fakorede had withdrawn and his net collections after his first year of practice. (*See* Ex. A, Recruiting Agreement ¶ 3(e).)  Dr. Fakorede relied upon the staff at MSHC to submit the supporting financial reports associated with the Net Collections Support Account. (*See* Compl. ¶ 51.)

According to the Complaint, as of December 8, 2014, MSHC had submitted financial reports for Dr. Fakorede's first two quarters of practice but had not submitted a year-end financial statement. (*See id.* ¶ 53.) Dr. Fakorede contacted the Hospital to request the financial reports submitted by MSHC. (*See id.* ¶ 55.) After reviewing the first and second quarter reports, he was "troubled" by expenses that had been attributed to him relating to the construction and operation of MSHC's newly-completed outpatient-based lab. (*See id.* ¶¶ 56-58.) In particular, Dr. Fakorede was concerned that the lab had not been used at all until August 2014 and had not been used by him until October 2014. (*See id.* ¶ 57.)

Dr. Fakorede again requested financial reports from the Hospital in early January and ultimately received the full-year financial report on January 9, 2015. (*See id.* ¶¶ 60-61.) He found this report to be "troubling" because MSHC had attributed expenses to him that he believed did not relate to his employment. (*See id.* ¶ 62.) He does not allege that he communicated to anyone at MSHC any concerns about the expenses or that they posed any risk of potential healthcare regulatory violation. He also requested the underlying documentation from the Hospital supporting the claimed expenses. (*See id.* ¶ 61.)

On January 9, 2015, the Financial Director of the Hospital, Carla Reeves, sent an email to MSHC's Practice Manager, Charlotte Beard, and its outside accountant, Mickey Hannon, noting that Dr. Fakorede had "'raised some questions' and was requesting certain underlying documents." (*See id.* ¶ 66.) Ms. Reeves then "asked the Clinic to provide a detailed schedule to support the depreciation calculations." (*Id.*)

On January 10, 2015, Dr. Fakorede emailed representatives of the Hospital and MSHC and "expressed concerns about the financial report and requested that the District collaborate with the Clinic" regarding certain expenses that had been attributed to him. (*Id.* ¶ 67.) Dr. Fakorede does not allege that he ever requested any information from MSHC relating to the financial reports or expenses. He further does not allege that he expressed any concerns to MSHC regarding the expenses that MSHC had attributed to him or that he discussed the expenses at all with anyone at MSHC.

On January 12, 2015, MSHC's accountant opined that the expenses in the financial reports had been correctly attributed to Dr. Fakorede. (*See id.* ¶ 68.) Nevertheless, Dr. Fakorede "became concerned that the Clinic was deliberately and fraudulently misclassifying many of its

expenses," but he does not allege that he expressed any of these purported concerns of fraud to MSHC or anyone else. (*Id.* ¶ 69.)

Dr. Fakorede subsequently contacted the Hospital's CEO "requesting an independent review" and noted that he had not received the supporting documentation that he previously requested from the Hospital. (*Id.* ¶ 72.)

Ultimately, the Hospital audited MSHC's financial reports and disallowed some of the claimed expenses. (*See id.* ¶ 96.) The Hospital calculated the amount of the refund owed by MSHC as $314,238.08. (*See id.*) The Complaint does not suggest that amount was not repaid to the Hospital in accordance with the Recruiting Agreement.

## III.    Allegations About Dr. Fakorede's Termination

Dr. Fakorede worked at MSHC from November 1, 2013 for just over one year and three months. (*See* Compl. ¶¶ 38, 83-86.) Dr. Fakorede alleges that, on February 10, 2014, Dr. Louis Cunningham of MSHC met with him and stated that "he knew [Dr. Fakorede] was not happy and that the Clinic was not happy either."[3] (*Id.* ¶ 84.) Dr. Cunningham then allegedly requested that Dr. Fakorede resign. (*See id.*) When Dr. Fakorede declined, Dr. Cunningham terminated his employment from MSHC on February 11, 2014. (*See id.* ¶ 86.) Following his termination, MSHC provided Dr. Fakorede with a full 120 days of pay. (*See id.* ¶ 88.)

---

[3]    The Complaint does not contain complete details about the circumstances that resulted in Dr. Fakorede's termination. While MSHC is precluded at this time, pursuant to the standard of review applicable to a Rule 12(b)(6) motion, from providing additional facts that would further explain and contextualize the incomplete and misleading narrative set forth in the Complaint, MSHC strongly denies any insinuation that its decision to terminate Dr. Fakorede was in any way related to any "protected activity." Indeed, as explained below, the Complaint fails to adequately plead that MSHC had notice of any "protected activity" prior to Dr. Fakorede's termination, that any such activity even occurred, or that such activity was the motivating factor in his termination.

According to the Complaint, Dr. Fakorede accused the Hospital and MSHC of violating federal law ***after his termination***.  Following his termination, he wrote an email to the Hospital administration stating:

> This decision to terminate my employment, of course, comes amidst the line audit of the financial report for year one of my employment that is currently underway which thus far has revealed a false $207,000 dollars which was in clear violation of the recruiting agreement (stating that the agreement is not to be used for the Clinic's financial benefit) and in violation of Stark Laws.  It is fundamentally wrong to use the physician recruiting agreement funds which are aimed to assist the underserved patients of community to the benefit of the clinic, which is why the stark exception for physician recruitment agreements exists.

(*Id.* ¶ 91.)  Based on the allegations in the Complaint, this email, which was sent after his termination, constitutes the first instance in which Dr. Fakorede accused either the Hospital or MSHC of violating federal law.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires that a complaint articulate a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must be dismissed under Rule 12(b)(6) when it fails to contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint states a viable claim only if it:  (1) includes factual "allegations plausibly suggesting (not merely consistent with)" a particular defendant's liability; and (2) states the grounds on which the claim rests.  *Twombly*, 550 U.S. at 557.  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 555.  A plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* (citations and internal quotation marks omitted).  Rather, the court should disregard such legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678–79.  As the Supreme Court

explained in *Iqbal*, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

In the specific context of an FCA retaliation claim, the Sixth Circuit applies a heightened burden on plaintiffs to plead facts that make it clear that the employee's alleged protective conduct went beyond his normal duties and obligations in order to establish that his employer was on notice that he was engaging in protected conduct. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566-68 (6th Cir. 2003); *see also Maturi v. McLaughlin Research Corp.*, 413 F.3d 166, 172-73 (1st Cir. 2005) (citing *Yuhasz* and recognizing that courts place a "heighted burden" on plaintiff's pleadings in FCA retaliation cases).

## ARGUMENT

**I.     The Court May Consider the Recruiting Agreement and Employment Agreement as Part of the Pleadings for Purposes of This Motion.**

Although a court deciding a motion to dismiss ordinarily limits its review to the face of the pleadings, the Sixth Circuit has explained that "a document that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings." *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). This occurs where, as here, "a document is referred to in the complaint and is central to the plaintiff's claim" and the moving defendant submits "an authentic copy to the court to be considered on a motion to dismiss." *Id.* (citation and internal quotation marks omitted). A finding that documents are incorporated by reference is particularly appropriate where the documents are "referred to throughout the complaint" and "are central to [plaintiff's] claims." *Id.*; *see also Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (explaining that a plaintiff cannot "survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied").

Here, the Complaint refers to and references the Recruiting Agreement and Employment Agreement throughout. (*See, e.g.*, Compl. ¶¶ 2-9, 17-18, 37-38, 44, 70.) Further, the Recruiting Agreement and Employment Agreement are central to Dr. Fakorede's claim as they define the relationship of the parties at issues, the terms of Dr. Fakorede's employment, his contractual duties, the financial reporting obligations at issue, and the terms governing termination. Thus, this Court should consider both the Recruiting Agreement and Employment Agreement as incorporated by reference in the Complaint.

## II. The Complaint Fails to State a Plausible FCA Retaliation Claim.

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The anti-retaliation provision of the FCA was enacted to "protect[] employees who pursue, investigate, or otherwise contribute to an action exposing fraud against the government." *Yuhasz*, 341 F.3d at 566. It imposes liability on any employer who discharges an employee "because of lawful acts done by the employee . . . in furtherance of an [FCA] action or other efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). To establish an FCA retaliation claim, Dr. Fakorede must plausibly allege: "(1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz*, 341 F.3d at 566.

Dr. Fakorede's Complaint fails to specify whether he is alleging retaliation for actions in furtherance of an FCA action or efforts to stop an FCA violation. (*See* Compl. ¶¶ 107-110.) Regardless, as demonstrated below, he has failed to plead facts to support an FCA retaliation claim under either theory.

### III. The Complaint Does Not Plausibly Allege a Protected Activity.

#### A. Dr. Fakorede Does Not Allege He Intended to Further an FCA Action.

In order to plead the first element of an FCA retaliation claim under the theory that the employee was furthering an FCA action, an employee "must allege fraud on the government" to establish protected activity. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)). "If a plaintiff's allegations fall short of reaching a nexus with a viable FCA action, . . . he has not, as a matter of law, engaged in protected activity." *Bonewitz v. NewQuest, LLC*, No. 3:14-CV-00096, 2015 WL 1825375, at *6 (M.D. Tenn. Apr. 22, 2015) (citing *Hopper*, 91 F.3d at 1269).

In this case, Dr. Fakorede has not alleged that the actions he took were "in furtherance of an [FCA] action." § 3730(h)(1). The Complaint does not allege that Dr. Fakorede expressed his intention to bring or assist in an FCA action at the time he engaged in the conduct described in the Complaint. Nor does the Complaint allege that Dr. Fakorede ever brought or assisted in an FCA action. The Complaint does not even allege that Dr. Fakorede, at any point prior to his termination, contemplated bringing or otherwise furthering an FCA action. Thus, the Complaint fails to allege facts that could plausibly support a nexus with a viable FCA action, as required by the Sixth Circuit, and Dr. Fakorede has failed to allege a protected activity under the first category listed in § 3730(h)(1). *Bonewitz*, 2015 WL 1825375, at *6.

#### B. Dr. Fakorede Does Not Plausibly Allege Efforts to Stop an FCA Violation.

In order to allege that an employee engaged in a protected activity by taking efforts to stop an FCA violation, "an employee's conduct must be aimed at stopping specific fraudulent claims against the government." *Verble v. Morgan Stanley Smith Barney, LLC*, No. 3:15-CV-74-

TAV-CCS, 2015 WL 8328561, at *11 (E.D. Tenn. Dec. 8, 2015) (citing cases). Conversely, "an employee's general desire to prevent or uncover unspecified fraudulent acts" does not constitute protected activity. *Kem v. Bering Straits Info. Tech.*, No. 2:14-CV-263, 2014 WL 5448402, at *4 (S.D. Ohio Oct. 22, 2014). As the Sixth Circuit has held, "a plaintiff's activities must reasonably embody 'efforts to stop' FCA violations." *Jones-McNamara v. Holzer Health Sys.*, No. 15-3070, 2015 WL 6685302, at *5 (6th Cir. Nov. 2, 2015).

With respect to Dr. Fakorede's conduct prior to his termination, the Complaint alleges that he raised concerns and questions about certain expenses that the Hospital had attributed to him as a cost of adding him to the practice at MSHC. (*See* Comp. ¶¶ 54-58, 60-61, 66-67, 72.) He does not, however, allege that he raised concerns about false claims for payments or other violations of federal law prior to his termination. Indeed, while the Complaint alleges that Dr. Fakorede subjectively **believed** there was fraudulent activity, none of his **statements** referenced in the Complaint pertain to alleged violations of federal law. Those allegations are inadequate to establish a protected activity under well-settled law. *See Miller v. Abbott Labs.*, No. 3:14CV-00363-JHM, 2015 WL 3773114, at *6 (W.D. Ky. June 17, 2015) (holding that plaintiff failed to show a protected activity where she did not raise the possibility that her employer "was possibly engaged in fraud on the government, a violation of the False Claims Act, or Anti–Kickback Statute"); *United States ex rel. Lockyer v. Hawaii Pacific Health*, 490 F. Supp. 2d 1062, 1084 (D. Haw. 2007) (holding that physician's inquiries into billing practices did not amount to protected conduct where the physician did not express concerns about "overcharging the government for claims that [his employer] was not entitled to bill"). As such, his alleged conduct cannot plausibly embody efforts to stop an FCA violation or any other healthcare

regulatory violation and, therefore, does not constitute protected conduct under § 3730(h). *Jones-McNamara*, 2015 WL 6685302, at *5.

Based on the allegations in the Complaint, Dr. Fakorede did not express concerns about violations of federal law until ***after*** he was terminated. (*See* Compl. ¶ 91.) However, Dr. Fakorede cannot rely on activity that occurred after his termination to support his claim because such activity could not be causally linked to his termination. *See Yuhasz*, 341 F.3d at 566 (explaining that employee must show he was discriminated against "as a result of the protected activity"). For this reason, his alleged post-termination accusations regarding violations of federal law are insufficient to state an FCA retaliation claim.

## IV. The Complaint Does Not Contain Facts That Plausibly Show MSHC Had Notice of Any Alleged Protected Activity.

"'When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.'" *Yuhasz*, 341 F.3d at 567 (quoting *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996)). With respect to what it takes to plead this notice element, the Sixth Circuit has held that, where plaintiff's alleged "activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of [his] job duties," plaintiff's allegations will be insufficient to state an FCA retaliation claim. *Id.* (emphasis added and citation omitted). Rather, a plaintiff must allege that he took additional steps beyond his normal duties to "put defendants on notice . . . that [he] was furthering or intending to further an FCA action." *Id.* (citation omitted).

For example, in *Yuhasz*, plaintiff worked for a manufacturer of alloys used in aerospace military operations and, as part of his job duties, was responsible for submitting certifications of

compliance with technical specifications. *Id.* at 562. Plaintiff alleged that he was terminated in retaliation for reporting that his employer had submitted false certifications in violation of the FCA. *Id.* The Sixth Circuit found that plaintiff's allegations were insufficient to state an FCA retaliation claim, despite the fact plaintiff had alleged that he "'specifically informed and advised [defendant] of the unlawful and illegal nature of its certifications of compliance' and 'specifically raised with [defendant] . . . that other companies had incurred liabilities under the False Claims Act for submission of false and fraudulent claims." *Id.* at 567 (quoting plaintiff's complaint). The *Yuhasz* court reasoned that "the concerns about potential liability under the FCA raised by [plaintiff] . . . were entirely within the scope of his duties, and thus did not put [his employer] on notice that he was engaging in protected activity." *Id.* It further explained:

> By informing [his employer] that its certifications were illegal and that other companies had incurred liability under the FCA for false claims, [plaintiff] was simply performing his ordinary duties as a supervisor of laboratory testing. [Plaintiff] cannot be charged with notice on this basis. . . . The mere fact that [plaintiff] told [his employer] that its certifications of compliance were "unlawful and illegal" does not establish notice.

*Id.* (citations omitted). Relying on its previous ruling in *McKenzie*, 219 F.3d 508, the Sixth Circuit held, "a plaintiff still must show that his employer was aware of his protected activity. Merely grumbling to the employer about . . . regulatory violations does not satisfy the requirement." *Yuhasz*, 341 F.3d at 567-68 (citations and internal quotation marks omitted). Rather, employees "'must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.'" *Id.* at 568 (quoting *Ramseyer*, 90 F.3d at 1523 n.7).

As explained above, Dr. Fakorede never acted to further an FCA action, much less put MSHC on notice that he was furthering or intending to further an FCA action. Nor did he do anything that would have put MSHC on notice that he was taking actions to stop an alleged FCA

violation.  While the Complaint alleges that Dr. Fakorede was "concerned" about alleged fraudulent activity and "believed" such activity was occurring (Compl. ¶¶ 69-70), it does not allege that he accused MSHC or anyone else of violating or attempting to violate the FCA, the Stark Law, the Anti-Kickback Statute, or any other law prior to his termination.  Indeed, most of his alleged statements about the content of the financial reports were made only to representatives of the Hospital, not MSHC.  (*See id.* ¶¶ 54-65, 69-82.)  And, his concerns were that he would be on the hook for improperly attributed expenses as opposed to such conduct constituting any type of fraudulent activity.

The only conduct of which the Complaint alleges MSHC was made aware prior to Dr. Fakorede's termination constituted the following:  (1) Ms. Reeves from the Hospital sent an email to MSHC's practice manager and outside accountant indicating that Dr. Fakorede had "'raised some questions' and was requesting certain underlying documents"; and (2) Dr. Fakorede sent an email to recipients, including MSHC's practice manager and outside accountant, that "expressed concerns about the financial report and requested that the District collaborate with the [MSHC] to revisit the Depreciation expense drawn from his loan[.]"  (*Id.* ¶¶ 66-67.)  Neither of these statements explicitly or implicitly suggests that MSHC violated or was attempting to violate the FCA.  Dr. Fakorede does not allege that had a single discussion with anyone at MSHC regarding the financial reports or the expenses that MSHC had attributed to him or that he ever suggested that MSHC was engaged in conduct that violated federal healthcare laws.

In sum, the allegations in the Complaint are insufficient to have put MSHC on notice that Dr. Fakorede was pursuing an FCA action or attempting to stop an alleged FCA violation.  As courts have repeatedly explained, "the employee must, at least to some degree, couch her

concerns or investigation in terms of funds her employer fraudulently obtained from the government" in order to establish the notice element. *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1055 (N.D. Ill. 1998), *aff'd*, 183 F.3d 730 (7th Cir. 1999). Where, as here, a plaintiff's alleged "actions were not sufficiently connected to exposing fraud or false claims against the federal government," an FCA retaliation claim cannot be established. *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 803 (M.D. Tenn. 2010). Because Dr. Fakorede has not alleged that he voiced concerns about fraud or false claims to the federal government to MSHC, his FCA retaliation claim fails.

At most, Dr. Fakorede alleged statements indicate that he was following up on the accuracy of the financial reports that MSHC submitted to the Hospital in connection with his Employment Agreement and the Recruiting Agreement. As explained above, however, allegations of activity that would constitute performance of "his ordinary duties" cannot put his employer on notice of the alleged protected activity. *Yuhasz*, 341 F.3d at 567. Even though Dr. Fakorede alleges that he subjectively believed – while failing to express his purported belief to his employer – that his alleged activity was aimed at stopping healthcare regulatory violations, his conduct was insufficient to put MSHC on notice. As the Sixth Circuit has held, an employer "cannot be charged with notice" based upon mere knowledge of conduct that would constitute the employee "simply performing his ordinary duties." *Id.*

Even examining Dr. Fakorede's alleged conduct directed at the Hospital, it too was insufficient to create notice of his intent to pursue an FCA action or stop healthcare regulatory violations. Dr. Fakorede alleges that he sought information from the Hospital about the financial reports that were submitted (Comp. ¶¶ 60-61), "raised some questions" and "expressed concerns" about the financial reports (*id.* ¶¶ 54-58, 66-67), and requested an audit of the reports

(*id.* ¶ 72). He does not allege that he raised the possibility of healthcare regulatory violations with the Hospital before his termination. Further, such alleged activities fell within the scope of his employment and contractual obligations requiring accurate and compliant financial reports. (*See* Ex. B, Employment Agreement, ¶ 27; Ex. A, Recruiting Agreement ¶ 3.d.-3.e.) Given that submission of accurate financial reports was a requirement of his Recruiting Agreement, this conduct could not have "put defendants on notice . . . that [he] was furthering or intending to further an FCA action" – even if the conduct was directed at MSHC, which it was not. *Yuhasz*, 341 F.3d at 567.

Because the factual allegations in the Complaint do not plausibly suggest that MSHC was aware – at the time it terminated Dr. Fakorede – that he had allegedly tried to further an FCA action or stop healthcare regulatory violations, the Complaint fails to establish the notice requirement to support an FCA retaliation claim. *See United States ex rel. Robinson-Hill v. Nurses' Registry & Home Health Corp.*, No. CIV.A. 5:08-145-KKC, 2012 WL 4598699, at *14 (E.D. Ky. Oct. 2, 2012) (explaining that plaintiffs "must plead facts that their actions put [employer] on notice that they were actually pursuing or assisting an FCA action—not just that their complaints could lead to an FCA action sometime in the future"); *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08-CV-00114, 2012 WL 628515, at *11-12 (S.D. Ohio Feb. 27, 2012) ("Based on the Plaintiff's own pleadings, he never indicated any intentions to pursue investigation of the fraud, report the fraud, or otherwise take action or assist the government in prosecuting the fraud under the FCA.").

## V. The Complaint Fails to Allege a Plausible Causal Link Between Dr. Fakorede's Alleged Protected Conduct And His Termination.

The Complaint does not set forth adequate factual allegations that, taken as true, plausibly support Dr. Fakorede's contention that he was "discharged or otherwise discriminated

against . . . as a result of [a] protected activity." *Yuhasz*, 341 F.3d at 566. For instance, the Complaint does not allege that Dr. Cunningham was aware, when he terminated Dr. Fakorede, of any alleged activities that would constitute furtherance of an FCA action or efforts to stop an FCA violation. (*See* Compl. ¶¶ 83-86.) As such, the Complaint fails to state the necessary causal link between an alleged protected activity and Dr. Fakorede's termination. *See United States ex rel. Lee v. Textron Marine & Land Systems*, 2013 U.S. Dist. LEXIS 147434, at *3-4 (E.D. La. Oct. 11, 2013) (dismissing FCA retaliation claim because plaintiff "failed to allege any facts showing that the individual(s) who fired her even knew she was engaged in protected activity, much less that they fired her because she engaged in protected activity"). At best, the Complaint makes the conclusory allegation that "Defendant knew that Plaintiff had engaged in protected conduct, and Defendant terminated his employment in retaliation for Plaintiff engaging in this protected conduct." (Compl. ¶ 109.) As the Sixth Circuit has explained, however, a court "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013) (citation and quotation marks omitted). Because Dr. Fakorede's allegations about causation are purely conclusory, the Court should disregard them for purposes of this motion.

## CONCLUSION

For all the reasons stated above, Dr. Fakorede has failed to allege a plausible FCA retaliation claim, and the Court should dismiss Plaintiff's Complaint in its entirety for failure to state a claim under Rule 12(b)(6).

DATED this the 20th day of January, 2016.

Respectfully submitted,

*/s/ Brian D. Roark*

Brian D. Roark (#20262)
Brittain W. Sexton (#27525)
**BASS BERRY & SIMS PLC**
150 Third Ave. South, Suite 2800
Nashville, Tennessee 37201-3001
Telephone: (615) 742-6200
Facsimile: (615) 742-0442
broark@bassberry.com
bsexton@bassberry.com

Todd D. Siroky (#24708)
**SIROKY LAW, PLC**
316 South Shannon Street
Jackson, TN 38302-1625
Telephone: (731) 300-3636
Facsimile: (731) 300-3638
todd@sirokylaw.com

*Attorneys for Defendant Mid-South Heart Center, P.C.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served upon opposing counsel, via the Court's CM/ECF e-mail notification system, on this the 20th day of January, 2016:

**Jerry E. Martin**
**Scott P. Tift**
**Seth M. Hyatt**
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Phone: (615) 244-2202
Fax: (615) 252-3798
jmartin@barrettjohnston.com
stift@barrettjohnston.com
shyatt@barrettjohnston.com

*/s/ Brian D. Roark*
Brian D. Roark