IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

FOLUSO FAKOREDE,

     Plaintiff,

v.                                    No. 15-1285

MID-SOUTH HEART CENTER, P.C.,

     Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
_____

## INTRODUCTION

This action was brought on November 25, 2015, by the Plaintiff, Foluso Fakorede, against Defendant, Mid-South Heart Center, P.C. ("MSHC" or the "Clinic"), alleging retaliation in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h). (D.E. 1.) Before the Court is the Defendant's motion to dismiss the action in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (D.E. 16.)

## STANDARD OF REVIEW

Rule 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). A complaint "must contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)) (internal quotation marks omitted), *reh'g en banc denied* (Feb. 19, 2016). The court is to "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether

1

the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Solo v. United Parcel Serv. Co.,* ___ F.3d ___, 2016 WL 1077163, at *3 (6th Cir. Mar. 18, 2016) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). However, "a legal conclusion couched as a factual allegation need not be accepted as true." *Johnson v. Moseley,* 790 F.3d 649, 652 (6th Cir. 2015) (internal quotation marks omitted). Plaintiff's obligation under Rule 12(b)(6) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, "[c]onclusions must be supported by factual allegations to state a claim and meet" the pleading requirements of Fed. R. Civ. P. 8.[1] *Verble v. Morgan Stanley Smith Barney, LLC*, ___ F. Supp. 3d ___, 2015 WL 8328561, at *11 (E.D. Tenn. Dec. 8, 2015) (citing *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted), *appeal filed* (No. 15-6397) (6th Cir. Dec. 17, 2015).

*FACTS ALLEGED*

The following allegations are set forth in the complaint and, for purposes of this motion, taken as true. In the spring of 2012, Fakorede, a physician, was in the process of completing cardiology training at Cooper University Hospital in Camden, New Jersey, when he was approached by one of MSHC's partners concerning an employment opportunity in Jackson, Tennessee. On July 15, 2013, he, the Defendant, and Jackson-Madison County General Hospital District (the "Hospital") entered into a Physician Employment Agreement and a Recruiting Assistance Agreement (collectively, the "Contract"). The stated purpose of the Contract was to recruit the Plaintiff to locate his practice in Jackson in order to address a "substantial need for an

---

[1]Rule 8 provides that a pleading must contain "a short and plain statement of the grounds for the court's jurisdiction, . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought[.]" Fed. R. Civ. P. 8(a).

additional physician practicing in the specialty of Interventional Cardiology . . . [which] would benefit the community . . . through increased availability, quality, and choice of patient care." (D.E. 18-1 at PageID 73.)

Under the Contract, he received one-time moving and transition advances totaling $80,000.00 and an educational loan repayment of $30,000.00 per year for each of the three years covered by the arrangement. In addition, the Hospital agreed to establish a Net Collection Support Account (the "Support Account") up to a maximum amount of $500,000.00 for his first year. The purpose of the Support Account was to supplement his net collections as he worked to establish his practice. The maximum the Hospital would provide was the difference between Dr. Fakorede's actual net collections for the year and $500,000.00. Thus, if his gross collections during year one were $400,000.00 and his incurred expenses $100,000.00, his net collections would be $300,000.00. In that scenario, the Hospital would advance to him an amount up to $200,000.00.

The Hospital's financial obligations to the Plaintiff depended in part on outlays MSHC claimed as "actual direct incremental expenses" attributable to his employment. (D.E. 1 ¶ 42.) To this end, the Hospital required the Clinic to submit a financial statement no later than thirty days following the end of the physician's first year of practice. In the event MSHC and the Plaintiff drew more than the permitted amount, they were bound to remit the difference to the Hospital. To avoid incurring interest, overpayments had to be repaid within thirty days. Dr. Fakorede agreed to practice in the Jackson area for a period of at least three years and maintain medical staff privileges at the Hospital for the three-year term. If he fulfilled his obligations, the Hospital would forgive all debt he had incurred. If not, Plaintiff was required to immediately repay all funds advanced to him by the Hospital.

In addition, the Defendant agreed, for purposes of its compliance with the Stark Law and

42 C.F.R. § 411.357(e),[2] in part as follows:

> It is the intent of the parties to comply with all state and federal laws in the performance of this Agreement. Clinic understands and agrees that the purpose of this recruiting arrangement is not for the Clinic's financial benefit but is to assure a fixed amount of net collections to support the recruited physician's first year of practice and that only certain expenses permitted by recruiting laws (those direct expenses that are the actual incremental expenses of recruiting the Physician and establishing Physician's practice) can be reimbursed by Hospital. Any recruiting remuneration provided by Hospital will be paid directly to Physician, not to Clinic, and as such will not be passed through Clinic to Physician, but rather will remain with Physician, except for the actual direct incremental costs attributable to the recruitment of the Physician and the Physician's practice. Clinic agrees to submit financial accountings to Hospital on a timely basis as requested and required by Hospital, and in such accountings will include only those expenses which are legally permitted by federal laws governing recruitment arrangements.

---

[2]Simply put, the Physician Self-Referral Act, commonly known as the Stark Law, 42 U.S.C. § 1395nn, prohibits doctors from referring patients to a provider if the referring physician has a "financial relationship" with the provider. 42 U.S.C. § 1395nn(a)(1)(A); *United States ex rel. Robinson-Hill v. Nurses' Registry & Home Health Corp.*, Civ. Action No. 5:08-145-KKC, 2015 WL 4394203, at *3 (E.D. Ky. July 15, 2015). It further proscribes the provider from presenting claims for services rendered pursuant to a prohibited self-referral. 42 U.S.C. § 1395nn(a)(1)(B); *Robinson-Hill*, 2015 WL 4394203, at *3. The regulations promulgated under the statute set forth the types of compensation arrangements that do not constitute a "financial relationship." *See* 42 C.F.R. § 411.357. One of these is the physician recruitment exception, which states that "[r]emuneration provided by a hospital to recruit a physician that is paid directly to the physician and that is intended to induce the physician to relocate his or her medical practice to the geographic area served by the hospital in order to become a member of the hospital's medical staff" is not a "financial relationship" if "[t]he amount of remuneration under the arrangement is not determined in a manner that takes into account (directly or indirectly) the volume or value of any actual or anticipated referrals by the physician or other business generated between the parties[.]" 42 C.F.R. § 411.357(e)(1)(iii).

> In the case of remuneration provided by a hospital to a physician either directly or indirectly through payments made to another physician practice, or directly to a physician who joins a physician practice, [an] additional condition[] must be met: . . . [i]n the case of an income guarantee of any type made by the hospital to a recruited physician who joins a physician practice, the costs allocated by the physician practice to the recruited physician do not exceed the actual additional incremental costs attributable to the recruited physician.

42 C.F.R. § 411.357(e)(4)(iii).

(D.E. 18-1 at PageID 83.)

In his first year, which ended October 31, 2014, Dr. Fakorede had gross collections of $751,221.92. Nonetheless, MSHC instructed him to take the maximum possible draw from the Support Account for the first two quarters as well as a sizeable sum for the last two quarters. It also required him to immediately assign those moneys to the Clinic. During this initial year in Jackson, he was not provided data regarding the collections he brought into MSHC or the expenses it attributed to the establishment of his practice.

As noted above, the Defendant was to submit its year-end financial statement to the Hospital by November 30, 2014, for the purpose of providing evidence of the gross collections Dr. Fakorede brought into the Clinic, as well as proof of the expenditures MSHC declared as actual incremental expenses relating to his practice. The statement was not provided by the required date.

On or about December 8, 2014, Plaintiff requested the records from Carla Reeves, the Hospital's financial director. It was at this time he became aware that the twelve-month financial report had not been submitted by MSHC. He asked her to forward the records to him as soon as she received them because he wanted to review the Clinic's calculations prior to their submission in final form. Reeves offered to provide him a partial financial statement, dated June 10, 2014, tendered by MSHC's accountants and covering the first two quarters.

Upon his review of the statement, he discovered that the Clinic had calculated his first quarter net collections as negative $48.26, despite the fact that his gross collections for that time period were $99,879.75. For the second quarter, MSHC determined his net collections to be $6,258.14, notwithstanding gross collections of $188,894.41. In addition, Dr Fakorede noted

that MSHC attributed more than $127,000.00 in "depreciation expense" to him, which was identified as relating to equipment purchased, moved and installed at the Clinic's newly completed outpatient-based lab ("OBL"), even though the facility was not used at all until August 2014 and not by Plaintiff until late October of that year. Other significant expenses were also attributed to him, including "salaries and wages (incremental staff)," legal and professional expenses, consulting expenditures and "medical supplies (nuclear & OBL)." (D.E. 1 ¶ 58.)

In early January 2015, Dr. Fakorede emailed Reeves, again requesting the complete financial statement. Based on the concerns raised during his review of the partial statement, he also requested the underlying documents justifying MSHC's calculations. He received the full report on January 9, 2015, but not the supporting records. The complete statement brought to light expenses totaling $588,418.67 that MSHC falsely, in Plaintiff's view, claimed were directly attributable to his employment. These included a total "depreciation" expense for the year of $207,230.94, $131,190.04 in medical supplies, and $110,051.52 in staff salaries and wages.

Also on January 9, 2015, Reeves sent an email to MSHC Practice Manager Charlotte Beard and outside accountant Mickey Hannon advising them that the physician had "raised some questions" and was requesting certain underlying documentation. (*Id.* ¶ 66.) Reeves asked the Clinic to provide a detailed schedule supporting the depreciation calculations. The following day, Plaintiff emailed the Hospital, Reeves, Beard and Hannon, expressing concerns about the financial report and seeking collaboration between the Hospital and MSHC to revisit the depreciation expense drawn from his loan. He also informed them of his one-time use of the OBL on October 29, 2014, two days before his first term ended.

On January 12, 2015, Hannon responded to Reeves, stating that MSHC had begun initial plans to renovate its facilities to accommodate a new OBL/vein laboratory during the summer of

2013.  It was his opinion that, as the renovation was performed expressly "in anticipation" of the hiring of a new cardiologist, it was therefore reasonable to attribute that expense to Dr. Fakorede. (*Id.* ¶ 68.)  Hannon acknowledged, however, that no patients were actually seen in the laboratory until August 2014.  By that point, the physician claims, he had become concerned that MSHC "was deliberately and fraudulently misclassifying many of its expenses -- particularly those related to the OBL – as being related to Plaintiff's employment in order to get the [Hospital] to pay for them."  (*Id.* ¶ 69.)

Plaintiff sent a detailed email directly to Hospital CEO Bobby Arnold on January 16, 2015, requesting an independent review of the Hospital's report.  Therein, Dr. Fakorede specifically noted that his request for supporting documentation had been ignored.  He asked that the independent review be conducted by an auditor qualified "in health care matters who is familiar with Physician Assistance Agreement and Loan Income Guarantees."  (*Id.* ¶ 72.)  When he had not received a response to the email by January 21, 2015, Dr. Fakorede went to Arnold's office.  A secretary advised that Arnold was unavailable and instructed Plaintiff to resend the email, which she assured him would be seen by the CEO.  By January 30, 2015, the physician had still heard nothing.

On that date, however, Vanessa Patrick, a hospital recruiter responsible for recruiting cardiologists, contacted him on his cell phone to advise that the Hospital had disallowed the $207,230.94 "depreciation expense."  She did not mention the other charges he had flagged as questionable.

After making another attempt to speak with Arnold, Dr. Fakorede received a text message from the Hospital's vice president, Deann Montchal, on February 2, 2015, who said she had been "in conversation with everyone" and invited him to reach out to her with any questions.

(*Id.* ¶ 76.)  During a meeting between the two the same day, Monchal reported that she had

spoken with MSHC CEO Dr. Cunningham on January 30, 2015.  She had related to him that the

Hospital would be requesting a refund of the approximately $207,000.00 identified as

"depreciation expenses" for the OBL.  Again, none of the other charges to which Plaintiff had

objected were addressed, but she promised transparency going forward.  He received similar

assurances thereafter from Arnold, who also pledged to meet with him personally in the near

future.

The next day, February 3, 2015, Montchal advised Dr. Fakorede that the Hospital had

requested a complete line-item audit of MSHC's financial statement.  He emailed a response, in

which he

> reminded [Montchal] that the Recruiting Agreement that was signed by the
> [Hospital], the Clinic and himself, contained express language stating that the
> Recruitment Agreement was not meant to advance the [C]linic's financial
> interests and that only expenses permitted by federal law for the [H]ospital to
> cover are those expenses that are "the actual incremental expenses of recruiting
> the Physician and establishing the Physician's practice."

(*Id.* ¶ 80.)

On February 9, 2015, Plaintiff asked Montchal for an update.  She informed him that she

had seen one document over the past week referencing medical supplies and that she had given

instructions for "every line item [to] be audited."  (*Id.* ¶ 82.)  On February 10, 2015,[3] Dr.

Cunningham requested a meeting with Plaintiff at 6:00 that evening.  At the meeting, the Clinic

CEO instructed the physician to sign a letter of resignation by 7:00 the next morning or face

---

[3]Although the dates referred to in the complaint for Dr. Fakorede's inquiry to Montchal
and Dr. Cunningham's request for a meeting were February 9, 2014, and February 10, 2014,
respectively, the Plaintiff clarified in his response to the instant motion, and it is indeed clear
from a broad reading of the pleading, that the correct year in which these incidents occurred was
2015.

termination.  He provided no explanation other than to say generally that neither MSHC nor Dr. Fakorede was happy with the situation as it was.  The following morning, Plaintiff responded that he was unwilling to sign the letter in light of the pending audit and without the opportunity to review a corrected financial report.  Dr. Cunningham fired the Plaintiff, effective immediately, by text message.  Dr. Fakorede later received a letter from the Clinic stating that it was exercising its option to terminate his employment without cause.

The Plaintiff immediately notified Arnold and Montchal by email regarding his discharge, stating:

> This decision to terminate my employment, of course, comes amidst the line audit of the financial report for year one of my employment that is currently underway which thus far has revealed a false $207,000 . . . which was in clear violation of the recruiting agreement (stating that the agreement is not to be used for the Clinic's financial benefit) and in violation of Stark Laws.  It is fundamentally wrong to use the physician recruiting agreement funds which are aimed to assist the underserved patients of community to the benefit of the clinic, which is why the [S]tark exception for physician recruitment agreements exists.

(*Id.* ¶ 91.)

Arnold responded by relating that he regretted the development, was committed to a "fair and legal resolution of all issues for all involved," and looked forward to Plaintiff's continued service to the Hospital.  (*Id.* ¶ 92.)  The physician corresponded regularly with Montchal over the next few weeks, requesting updates on the Hospital's audit of MSHC's financial records and attempting to clarify his status under the Contract.  He received a letter on February 25, 2015, from Charleyn Reviere, the Hospital's general counsel, who informed him that she was responding on behalf of Montchal and that the reconciliation process between the Hospital and the Clinic was "nearing conclusion."  (*Id.* ¶ 94.)

On March 5, 2015, Dr. Fakorede received two letters from Reviere. The first contained results of the audit. The Hospital concluded that the $207,230.94 originally attributed to him as a "depreciation expense" was not a legitimate cost under the terms of the Contract and that additional expenditures were also disallowed. This resulted in an overdraft by MSHC of the Support Account in the amount of $314,238.08, which must be refunded. Notwithstanding this determination, the Hospital also found that allowable expenses totaled $332,088.46. Dr. Fakorede was not satisfied, as he continued to have misgivings about the financial report's accuracy, believed unlawful expenses remained after the audit, and still had not received the supporting documentation.

The second letter acknowledged the Hospital's understanding that he and MSHC had "ended their employment relationship" and advised that "[s]hould [Plaintiff] leave the community or cease practicing [in Jackson], then the current balance of the recruiting indebtedness would be due immediately." (*Id.* ¶ 102.) Believing the Clinic's retaliatory termination had rendered his continued practice in Jackson untenable, Dr. Fakorede relocated to Mississippi, where he resided and practiced as of the filing of the complaint. Plaintiff alleges in this action that MSHC retaliated against him for his efforts to prevent a violation of the federal Stark Law and Anti-Kickback Statute ("AKS").[4]

---

[4]Codified at 42 U.S.C. § 1320a-7b, the statute provides that

**(1)** whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

**(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

## ASSERTIONS OF THE PARTIES AND ANALYSIS

At the outset, the Court recognizes that, generally speaking, in considering a motion to dismiss under Rule 12(b)(6), the district court may not look outside the complaint, as to do so effectively converts the motion into one for summary judgment under Fed. R. Civ. P. 56. *Trs. of Detroit Carpenters Fringe Benefit Funds v. Patrie Constr. Co.*, 618 F. App'x 246, 255 (6th Cir. 2015). The court would then be required to give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, courts "may consider items appearing in the record of the case, including exhibits, without converting a Rule 12(b)(6) motion into a motion for summary judgment, but only so long as they are referred to in

---

**(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

**(2)** whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
**(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

**(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

the complaint and are central to the claims contained therein." *Patrie Constr.*, 618 F. App'x at 255 (emphasis & internal quotation marks omitted). As it was referred to in the complaint and is central to the Plaintiff's claims, the Court will consider the Contract in analyzing the motion to dismiss.[5]

The Court now turns to the claim at issue. The FCA "is an anti-fraud statute prohibiting the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Kreipke v. Wayne State Univ.*, No. 12-14836, 2014 WL 6085704, at *3 (E.D. Mich. Nov. 13, 2014), *aff'd* 807 F.3d 768 (6th Cir. 2015), *reh'g en banc denied* (Feb. 19, 2016). The statute "reaches claims submitted by health-care providers to Medicare and Medicaid -- indeed, one of its primary uses has been to combat fraud in the health-care field." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Section 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable to the United States government for civil penalties. 31 U.S.C. § 3729(a)(1)(A). "A fraudulent claim against the United States is the *sine qua non* of a[n FCA] violation." *Bonewitz v. NewQuest, LLC*, Civ. No. 3:14-CV-00096, 2015 WL 1825375, at *5 (M.D. Tenn. Apr. 22, 2015) (citing *United States ex rel. Sanderson v. HCA*, 447 F.3d 873, 878 (6th Cir. 2006)) (internal quotation marks omitted), *appeal filed* (No. 15-5552) (6th Cir. May 26, 2015). It is Plaintiff's position in this case that MSHC was using him to further an illegal kickback scheme and that it, under the guise of the Contract, sought and obtained hundreds of thousands of dollars from the Hospital that should never have been paid. He asserts that these overpayments could be construed as inducing referrals from the Clinic to the Hospital.

---

[5]Indeed, the Plaintiff has voiced no objection to the Court's consideration of the Contract in its Rule 12(b)(6) review.

The FCA provides a cause of action for retaliatory employment discrimination. Section 3730(h), under which this action has been brought, entitles an employee "to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . or in any other manner discriminated against in the terms or conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the statute]." 31 U.S.C. § 3730(h)(1). The purpose of the whistleblower provision is to "encourage any individual knowing of Government fraud to bring that information forward." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003).

A claim under § 3730(h) requires proof that (1) the plaintiff "was engaged in a protected activity"; (2) his "employer knew that [he] engaged in the protected activity"; and (3) his "employer discharged . . . the employee as a result of the protected activity." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015). Stated differently, an employee is entitled to recover under the statute "when [he] alleges that [he] observed purportedly fraudulent activity, [he] confronted [his] employer about it, and [his] employer fired [him] because of it." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.,* 525 F.3d 439, 449 (6th Cir. 2008) (citing *Mikes v. Strauss*, 889 F. Supp. 746, 752-53 (S.D.N.Y. 1995)). A § 3730(h) plaintiff need not plead or establish an actual violation of § 3729. *Jones-McNamara*, 630 F. App'x at 399 (citing *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 428 n.1 (2005)).

MSHC maintains that Dr. Fakorede has failed to sufficiently plead that he engaged in protected activity under the FCA. Plaintiff posits that he engaged in the second form of activity protected in the statute – taking actions in an effort to stop one or more violations of the FCA. To demonstrate retaliatory discharge based on this type of protected activity, "an employee must

be pursuing an effort to stop a *specific* violation (or potential violation) of the FCA of which he or she is aware." *Verble,* 2015 WL 8328561, at *10. The "employee's conduct must be aimed at stopping specific fraudulent claims against the government." *Id.* at *11; *Bonewitz*, 2015 WL 1825375, at *5 ("The protected activity must relate to 'exposing fraud' against the government or 'involvement with a false claims disclosure' to the government."). Such protected activity includes reporting suspected misconduct to internal supervisors. *Tibor v. Mich. Orthopaedic Inst.*, 72 F. Supp. 3d 750, 761 (E.D. Mich. 2014), *recons. denied* No. 14-10920, 2015 WL 144404 (E.D. Mich. Jan. 12, 2015). Internal reports of fraud "must sufficiently allege . . . fraud against the United States government." *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000).

Defendant submits in its motion to dismiss that, while the complaint alleges that Plaintiff raised concerns relative to certain expenses the Hospital attributed to him, he did not, as he must, aver that he complained about false claims for payments or other violations of federal law prior to his discharge. *Jones-McNamara* instructs that "a plaintiff's activities must reasonably embody efforts to stop FCA violations. *Jones-McNamara*, 630 F. App'x at 399 (internal quotation marks omitted). Internal reports must be "outside the employee's scope of employment, . . . do more than simply urge compliance with applicable regulations, and . . . rise to a level beyond merely reporting wrongdoing to supervisors." *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F. Supp. 3d 801, 822 (E.D. Tenn. 2015) (citing *McKenzie*, 219 F.3d at 516-17) (internal quotation marks omitted).

MSHC points to two district court decisions as supportive of its position: *Miller v. Abbott Laboratories,* Civ. Action No. 3:14CV-00363-JHM, 2015 WL 3773114 (W.D. Ky. June 17, 2015), and *United States ex rel. Lockyer v. Hawaii Pacific Health*, 490 F. Supp. 2d 1062 (D.

Haw. 2007). In *Miller*, the plaintiff's supervisor created a competition for employees in her division to submit written protocols, which were exclusivity agreements between Abbott and healthcare providers whereby the provider agreed to provide its patients with samples and coupons for Abbott's products. *Miller*, 2015 WL 3773114, at *2. The winner was to receive $100. *Id.* One of Miller's co-workers offered to split the award with a provider representative if she wrote the winning protocol for him. *Id.* Miller disclosed the bribe to her supervisor, who insisted she not inform company officials of the incident. *Id.* After she reported the bribe and the supervisor's reaction, the supervisor refused Miller vacation and training, threatened and screamed at her, and ultimately terminated her. *Id.*

In her subsequent FCA action, Miller claimed protected activity under the effort to stop clause. *Id.* at *4. The district court granted summary judgment in favor of her employer, finding that

> to constitute protected activity, Miller's report must specifically allege fraud on the government, and not just general misconduct. In the present case, Miller's internal reports merely alleged general misconduct by an employee at Abbott. Because § 3730(h) requires more than merely reporting wrongdoing to supervisors, Miller has not presented sufficient evidence to show that she was engaged in protected activity.

*Id.* at *6 (internal citations & quotation marks omitted); *see also United States ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1023 (S.D. Ohio 2014) ("Generalized complaints about wrongdoing are not sufficient to serve as predicate acts for FCA retaliations[; c]omplaints about wrongdoing are not actionable unless they concern fraud or false claims against the Government."). The court further noted that Miller did not inform her supervisor that Abbott was possibly engaged in fraud on the government in violation of the FCA or AKS but, rather, reported one instance of general misconduct by the co-worker. *Id.*

Lockyer, an internist at an outpatient clinic, had engaged in a long-running dispute with his employer over his compensation. *Lockyer*, 490 F. Supp. 2d at 1068-69. After the clinic reduced his salary on several occasions, Lockyer asked to review data concerning his billings and suggested that an audit be conducted. *Id.* at 1069. He later demanded arbitration over his employer's failure to produce requested compensation documentation to verify the grounds for his salary reduction. *Id.* at 1070. After he was fired, Lockyer brought an FCA suit, alleging that, upon his review of materials obtained during arbitration, he discovered reimbursements from Medicare/Medicaid for administration of chemotherapy at the clinic that he neither ordered nor provided. *Id.*

Lockyer argued on summary judgment that he engaged in protected activity by investigating the clinic's billing procedures, which, because of his medical practice, necessarily included claims for Medicare reimbursement. *Id.* at 1083. In finding for the defendant, the district court noted that, where courts have found a question of fact as to a plaintiff's engagement in protected activity, there is generally some evidence that the employee, at the time of the activity, expressed a suspicion of fraud. *Id.* In the case before it, however, Lockyer's evidence failed to show that, at the time he asked for his compensation data, he did so because he was suspicious of fraud against the government. *Id.* Rather, the proof established that he suspected he was being underpaid. *Id.* at 1084. Thus, the court concluded that "it seems the core of [p]laintiff's concern was that [the clinic] was under-reimbursing *him* for payment he was rightly owed under his employment contract, not that [the clinic] was overcharging the *government* for claims that it was not entitled to bill." *Id.* (emphasis added).

The outcome in *Lockyer* bears some similarity to a case from this Circuit, *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783 (M.D. Tenn. 2010), which was also decided on summary

judgment. Smith, a manager for a pharmaceutical company, alleged that he was wrongfully terminated in retaliation for his internal complaint against his employer's improper off-label promotion and sales of a particular drug. *Smith*, 730 F. Supp. 2d at 786-87. The court found that there was no protected activity because Smith was concerned about his personal liability for promotion of the off-label use, and was not seeking to expose any alleged fraud on the government. *Id.* at 803.

In response to the motion, Dr. Fakorede points to *Bonewitz* as a good articulation of the difference between protected and unprotected conduct. Bonewitz was employed as a systems analyst by NewQuest, LLC, a subsidiary of HealthSpring, Inc., which contracted with the United States to offer healthcare and prescription drugs to Medicare-eligible participants. *Bonewitz*, 2015 WL 1825375, at *1. Soon after his hire, he began receiving poor performance reviews from his supervisor. *Id.* Afterward, he informed the supervisor that he suspected HealthSpring was turning a blind eye to fraudulent activities. *Id.* The supervisor then gave Bonewitz a final notice for continued substandard performance. *Id.*

The employee later sent an email to Richard Appel, NewQuest's director of corporate compliance, sharing his belief that HealthSpring was incentivising physicians to perform overly-thorough examinations and encouraging internal fraud. *Id.* During a meeting with corporate counsel, the employee communicated his belief that HealthSpring "had a fiduciary duty to explain the pros and cons of an extended exam to every patient." *Id.* at *3. Bonewitz was eventually terminated. *Id.*

The court summarized the applicable law thusly:

[T]he internal reporting of wrongdoing must establish some nexus to the FCA by reasonably leading to a viable FCA action. If a plaintiff's allegations fall short of reaching a nexus with a viable FCA action, therefore, he has not, as a matter of

law, engaged in protected activity. In common parlance, therefore, an employee who complains about internal wrongdoing that could reasonably be a violation of the FCA and could lead to a viable FCA action may have engaged in protected activity. On the other hand, an employee who has complained of wrongdoing that cannot be an FCA violation or has no nexus to a viable FCA action has not engaged in a protected activity.

*Id.* at \*6 (internal alterations, citations & quotation marks omitted). Applying these principles, the court found that Bonewitz failed to establish protected activity because he "*never* raised any concern (internally or externally) regarding the submission of actual false claims to the United States by NewQuest -- the basic element of any viable FCA action." *Id.* Nor did he "complain[] to anyone at NewQuest (or elsewhere) that any false claims were being generated and submitted by NewQuest or paid to NewQuest by the government. Because Bonewitz had no complaints regarding actual false claims, he had no actual or potential viable FCA action. Bonewitz, therefore, was not engaged in protected activity" as to NewQuest. *Id.* (emphasis & internal footnote omitted). The court observed in a footnote that an employee's request for an independent evaluation, particularly where the request was not accompanied by a threat of FCA action or evidence of a false claim being submitted to the government, did not provide the necessary nexus to constitute protected activity. *Id.* n.8.

Other decisions from this Circuit reviewed by the Court are instructive as to the sufficiency of pleadings in § 3730(h) cases. In *Marlar*, the employee, a nurse practitioner at a nuclear power facility, alleged in her complaint that the company systematically underreported work-related injuries, illnesses and time missed from work in order to inflate its performance-based compensation under a contract with the federal Department of Energy (the "DOE"). *Marlar*, 525 F.3d at 442-43. She raised concerns regarding the underreporting on numerous occasions and was eventually placed on administrative leave. *Id.* at 443. While on leave, she

wrote a letter to Dennis Ruddy, the employer's president and general manager, asserting that her computer had been "cleaned out" because she refused to participate in "illegal activities," which included the underreporting. *Id.* She was later fired for insubordination. *Id.*

In finding her retaliation claim was sufficiently pleaded, the Sixth Circuit stated:

> Specifically, Ms. Marlar has pleaded that she repeatedly "objected to her superiors" about the inaccurate medical records . . . She raised similar objections during "an open forum where employees could express grievances or complaints." Ms. Marlar alleges that "as a result of these actions," she "was placed on administrative leave."

> While these allegations likely do not suffice to show that [her employer] was on notice of Ms. Marlar's protected activity, Ms. Marlar alleges that she took further steps that would constitute notice to [the employer]. Specifically, Ms. Marlar alleges that she wrote a letter to the president and general manager of [the employer], Mr. Ruddy, asserting that she had been placed on administrative leave "because she refused to participate in illegal activities . . . The letter further stated that the illegal activities included the underreporting of occupational injuries and illnesses resulting in large incentive payments to [the employer] under the contract with DOE. When [the employer] asked for more information regarding the alleged "illegal activities," Ms. Marlar told [officials] that "there was underreporting of work-related injuries and illnesses." Ms. Marlar's allegations, if true, would mean that [the employer] had defrauded the United States government, and Ms. Marlar made it clear that she understood that because she stated that [the employer's] activities, which she more precisely defined as "underreporting of work-related injuries and illnesses," were "illegal" and that [the employer] obtained "large incentive payments" pursuant to the DOE contract because of its "illegal activities."

*     *     *

> Ms. Marlar's complaint meets [the pleading standard for § 3730(h) claims]. She alleges that she observed purportedly fraudulent activity and confronted her employer about it. Specifically, Ms. Marlar told [her employer] that she believed [it] was receiving "illegal" "large incentive payments" under its contract with DOE because [the employer] was "underreporting its employees' work-related injuries and illnesses." She therefore connected her complaint of [the employer's] actions, underreporting, to a concern about fraud on the federal government. Ms. Marlar further alleges in her complaint that because she informed [the employer] of her concerns, she was terminated. Given our interpretation of "protected activity" in *McKenzie*, Ms. Marlar has adequately pleaded [a § 3730(h) claim].

*Id.* at 449-50 (internal alterations, citations & footnotes omitted).

In *Merritt*, in which the court found that "protected activity" under § 3730(h) had been sufficiently pleaded by plaintiffs Melinda Merritt and Benjamin Olivas, the latter had informed management that he "would not take such risks as falsely paying an undocumented worker" and "protested the employment of [an undocumented alien] as an illegality." *Merritt*, 96 F. Supp. 3d at 810, 823. The court noted, citing *Marlar*, that, "[i]f true, such conduct would constitute fraud upon the United States government, and Olivas' mention of 'risks' shows that he was aware of this." *Id.* at 823. With respect to Merritt, the court found that

> [she] sufficiently averred protected activity by telling her supervisor that "it was wrong of Mountain Laurel to hire an undocumented worker,' and -- crucially -- reporting her concerns to the IRS. While "wrong" may be construed in myriad ways in the instant context, the fact that Merritt reported her concerns to the IRS strongly suggests that she considered it *illegal* for Mountain Laurel to employ an undocumented worker. Her allegations thus, if true, would amount to fraud against the United States government, and her understanding of that is clear.

*Id.* (internal citations & footnote omitted).

The plaintiff in *Tibor*, a surgeon, refused to sign a proposed recruitment agreement with physician groups by which she had recently been employed because she believed it to be an illegal contract. *Tibor*, 72 F. Supp. 3d at 754. She explained to one of the physicians in the group that "she could not sign the backdated recruitment agreement because she believed it would be a violation of the Stark Anti-Referral Law," the same law invoked by Dr. Fakorede. *Id.* Tibor's refusal resulted in her discharge. *Id.* The court concluded that, as Tibor informed her employer of her concern of illegality with respect to the Stark Law, protected activity pursuant to § 3730(h) had been adequately pleaded. *Id.* at 762.

Finally, the Court finds of assistance in its determination an unreported case from the Southern District of Alabama, *United States ex rel. Heesch v. Diagnostic Physicians Group,*

*P.C.*, Civ. Action No. 11-0364-KD-B, 2014 WL 4812386 (S.D. Ala. Aug. 5, 2014). Heesch, a cardiologist, often submitted complaints to the physicians group by which he was employed concerning compensation and work-related issues. *Heesch*, 2014 WL 4812386, at *2. After difficulties in getting along with his co-workers arose, Heesch was given the opportunity to "discuss his future" with his employer or resign. *Id.* at *3. At around the same time, Heesch hired legal counsel. *Id.* The attorney formally requested extensive records from the group concerning physician compensation, Medicare payments and other financial documents. *Id.* Days afterward, he submitted a second request for "records and documents reflecting each physician's share of Stark Pool collections, and total Stark collections of the [employer] and specific allocation of collections to each doctor based on tests ordered but not performed by each physician." *Id.* (internal quotation marks omitted). The next month, Heesch learned at a group meeting that the employer "had previously received legal advice regarding their potentially illegal physician compensation structure, and he expressed his concerns." *Id.* Two days after the meeting, on July 13, 2011, he sent a letter to the group's president stating that the employer was "breaking the law regarding 'Stark Money' payments, and had been doing so for years." *Id.* Heesch was soon fired. *Id.*

On summary judgment, the court found that Heesch "began taking steps toward exposing false claims when he hired independent counsel and requested information from [the doctors' group] relating to their financial records and Stark collections" and, at that time, engaged in protected activity under § 3730(h). *Id.* at *5. The court further found that, "[t]hough [the employer] asserts [Heesch] couched his activities in general compensation concerns, [Heesch] undeniably put [the group] on notice of a potential FCA issue [(Stark violations)] when he sent his July 13 letter to [the group's president]." *Id.*

Dr. Fakorede contends in his brief that his actions beginning on January 10, 2015, constituted protected activity. (*See* D.E. 25 at PageID 135 (referencing D.E. 1 ¶¶ 67-82).) On that date, he "expressed concerns about the financial report and requested that the [Hospital] collaborate with the Clinic to revisit the Depreciation expense drawn from his loan," citing specifically his use of the OBL. (D.E. 1 ¶ 67.) According to the complaint, it was not until January 12, 2015, that he "had become concerned that the Clinic was deliberately and fraudulently misclassifying many of its expenses -- particularly those related to the OBL -- as being related to [his] employment in order to get the [Hospital] to pay for them." (D.E. 1 ¶ 69.) On January 16, 2015, he requested of Arnold an independent review of the Hospital's report, but there is no allegation that he gave the Hospital CEO any indication of concerns of fraud on the government. He argues that his request for an independent audit itself constitutes an effort to stop one or more FCA violations. However, the case upon which he has relied, *Bonewitz*, clearly suggests otherwise. *See Bonewitz,* 2015 WL 1825375, at *6 n.8. He has provided no other legal support for this assertion. On or about February 3, 2015, he reminded Montchal that "the Recruiting Agreement that was signed by the [Hospital], the Clinic, and himself, contained express language stating that the Recruiting Agreement was not meant to advance the [C]linic's financial interests and that only expenses permitted by federal law for the [Hospital] to cover are those expenses that are the 'actual incremental expenses of recruiting the Physician and establishing the Physician's practice." (D.E. 1 ¶ 80.) Urging compliance with the law is not protected activity. *See Merritt*, 96 F. Supp. 3d at 822.

Despite his insistence to the contrary, according to the well-pleaded factual allegations contained in the complaint, the Plaintiff's request for an audit, urgings to comply with the law and challenges relative to attribution of certain expenses to him prior to his termination are

insufficient, based on the caselaw reviewed by the Court, to allege protected activity under § 3730(h).  None of the internal reports made by Dr. Fakorede during this period alleged fraud on the government.  Indeed, his allegations reveal nothing more than a desire to minimize his personal financial liability under the Contract, not an effort to stop an FCA violation.

Further, as noted above, in addition to protected activity, a § 3730(h) plaintiff must adequately plead a connection between that conduct and his termination.  To establish the causation prong of the § 3730(h) claim, "an employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged . . . because of" protected activity.  *Howard*, 14 F. Supp. 3d at 1021 (citing *McKenzie*, 219 F.3d at 517).  "In order to prove that the action was taken 'because of' the protected activity, the employee must show that the retaliation was motivated, at least in part, by the employee's engaging in protected activity." *Id.* (internal quotation marks omitted).

While nothing prior to his termination constituted protected activity, Plaintiff's February 11, 2015, email to Arnold and Montchal arguably did.  The fatal flaw from a causation standpoint, viewing the allegations as true, is that Dr. Fakorede did not communicate his concerns about violations of federal law until *after* he received the message from Dr. Cunningham advising him that he had been fired.  Thus, he has averred nothing from which an inference may be reasonably drawn that the purported retaliatory conduct was taken after and in response to actions that could have been considered protected activity.  *See id.* at 1026 (plaintiff's claim failed where he had not "established that the purported retaliatory conduct was taken after and in response to his purported protected activity").  Accordingly, his termination obviously could not be said to have been because of protected activity contained in the post-

discharge email. As the complaint contains neither direct nor inferential allegations respecting all of the elements necessary for recovery under § 3730(h), it is DISMISSED.

*CONCLUSION*

For the reasons articulated herein, the motion is GRANTED.

IT IS SO ORDERED this 26th day of April 2016.

<u>s/ J. DANIEL BREEN</u>
CHIEF UNITED STATES DISTRICT JUDGE